UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| STEPHEN RADENTZ et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Cause No. 1:07-cv-1161-WTL-DML |
| | ) | |
| MARION COUNTY et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pending before the Court are three motions: (1) the Defendants' Motion for Summary Judgment against Dr. Stephen Radentz and Dr. Michele Catellier (Docket No. 82); (2) the Defendants' Motion for Summary Judgment against Forensic Pathology Associates of Indiana, LLC ("FPAI") (Docket No. 116); and (3) the Plaintiffs' Motion to File a Supplemental Designation of Evidence (Docket No. 125).  The motions are fully briefed, and the Court, being duly advised, **GRANTS** the Defendants' Motion for Summary Judgment against Radentz and Catellier, **DENIES AS MOOT** the Defendants' Motion for Summary Judgment against FPAI, and **GRANTS** the Plaintiffs' Motion to File a Supplemental Designation of Evidence, for the reasons and to the extent set forth below.

### I.  SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c)(2) provides that summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."

In ruling on a motion for summary judgment, the admissible evidence presented by the

non-moving party must be believed and all reasonable inferences must be drawn in the non-movant's favor. *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007); *see also* Fed. R. Civ. P. 56(e)(2). A genuine issue of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Methodist Med. Ctr. of Ill. v. Am. Med. Sec., Inc.*, 38 F.3d 316, 319 (7th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). The non-moving party bears the burden of demonstrating that such a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Wolf v. Northwestern Ind. Symphony Soc'y*, 250 F.3d 1136, 1141 (7th Cir. 2001), *cert. denied*, 534 U.S. 1028 (2001). "[T]he court is not required to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001).

In evaluating a motion for summary judgment, although the court draws all reasonable inferences from undisputed facts in favor of the nonmoving party and views the disputed evidence in the light most favorable to the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment. *See Anderson*, 477 U.S. at 248; *Pugh v. City of Attica, Ind.*, 259 F.3d 619, 625 (7th Cir. 2001). Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute; "instead, the nonmoving party must present definitely, competent evidence in rebuttal." *Butts v. Aurora*

2

*Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004). "If the nonmoving party fails to make a sufficient showing on an essential element of her case, the moving party is entitled to judgment as a matter of law because 'a complete failure of proof concerning an essential element of the [nonmovant's] case necessarily renders all other facts immaterial.'" *Lewis v. Holsum of Fort Wayne, Inc.*, 278 F.3d 706, 709 (7th Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

## II.  BACKGROUND

Dr. Kenneth Ackles, an African-American chiropractor, was elected Marion County Coroner in November 2004. As Ackles began the transition to his new position, there were apparently several bumps in the road. The outgoing Coroner, Dr. John McGoff, believed that several members of Ackles' transition team were responsible for a "breakdown in communication" between members of the Marion County Coroner's Office (the "MCCO") staff and members of Ackles' administration. McGoff Aff. ¶ 11. In addition, some MCCO staff members were concerned that Ackles would make staff and service provider changes. One MCCO employee was taken aback when she learned that either Ackles or one of his supporters, Deputy Coroner Alfarena Ballew, had been in discussions with Indiana Autopsy – an African-American owned pathology firm – about the possibility of the firm obtaining a contract with the Coroner's Office to provide autopsy services. Kelly Aff. ¶ 10. Other employees alleged that shortly after taking office, Ackles expressed a desire to hire more African-American employees.

When Ackles was elected, the MCCO had a contract with Indiana University ("IU"). IU provided the MCCO with physicians and support staff who performed forensic pathology services and autopsies. The IU contract was extremely favorable to Marion County because it

essentially subsidized Marion County several hundred thousand dollars each year.  The IU

contract expired on December 31, 2004, one day before Ackles took office on January 1, 2005.

However, IU continued to provide forensic pathology services for the MCCO.  In April 2005,

Ackles' Chief Deputy Coroner, John Linehan, learned that IU had not been paid for its services

since January 2005.  Ultimately, IU terminated its contract with the MCCO.

       To ensure continuity of autopsy services at the MCCO, Linehan contacted Dr. Stephen

Radentz and Dr. Michele Catellier, both board-certified forensic pathologists, and discussed the

possibility that they would provide the services formerly supplied by IU.  Radentz and Catellier

were both IU employees who had previously performed autopsy services for the MCCO.  When

Ackles decided to negotiate a forensic pathology contract between the MCCO and Radentz,

Catellier, and their limited liability company, FPAI, the parties decided to replicate the IU

contract as closely as possible.  Accordingly, in October 2005, the MCCO and FPAI entered into

a five-year contract whereby FPAI would provide forensic pathology services to the MCCO and

would perform autopsies upon request.  Under the contract, which was terminable without cause

upon six months' notice, the MCCO was required to furnish all of the supplies required to

perform autopsies (e.g. gloves, masks, test tubes, etc.).  The contract also allowed FPAI to

perform autopsies for other counties using the MCCO's facilities and supplies.

       After the MCCO-FPAI contract was signed, Linehan informed FPAI that the MCCO was

suffering a severe budget shortfall.  In fact, Linehan had determined that the MCCO would need

approximately $40,000 more each month to cover the cost of the FPAI contract.  City Controller

Robert Clifford assured Linehan that the funds would be available and that Linehan should seek

the necessary appropriations in two requests – one in the fall of 2005, and one in the spring of

4

2006. Thus, in November 2005, the MCCO received a budget of $271,800, to cover the FPAI contract. Apparently this appropriation came none too soon, as FPAI needed every dollar of the money it was paid by the MCCO to cover its operating costs and pay its staff.

In November 2005, Ackles terminated Linehan.[1] Linehan's termination caused Radentz and Catellier some concern about FPAI's future with the MCCO but after they met with Ackles they felt reassured. Ackles appointed Keith Conaway as interim Chief Deputy Coroner, but he ultimately hired Ballew, an African-American, as Chief Deputy Coroner. Ballew assumed her position on December 12, 2005, and almost immediately began handling the majority of the day-to-day decisions at the MCCO.

About a week after Ballew became Chief Deputy Coroner, Catellier informed her that FPAI was running low on autopsy supplies.[2] Around this same time, Ballew reviewed FPAI's contract with the MCCO and wrote the first of a series of notes or "diary entries" memorializing her opinions on various subjects. In this first note, Ballew opined that FPAI "associates refuse to follow procedures set forth by the county for supplies" and that "they continue to take in more cases from private attorneys and other counties, that has resulted in an increase in the need for supplies." Ballew Dep. Ex. 114. She concluded by noting that FPAI "feel[s] that their profit should be increased by allowing Marion County taxpayers to pay for those costs." *Id.*

---

[1] Linehan subsequently brought an EEOC complaint of reverse race discrimination against the MCCO. In November 2007, an Administrative Law Judge ("ALJ") found in his favor and awarded him damages. The MCCO appealed, and in August 2009, the U.S. Equal Employment Commission affirmed the ALJ's decision.

[2] Apparently in response to this information, on December 27, 2005, Ackles and Ballew sent FPAI a letter explaining the process that the MCCO must follow to order supplies. This letter asks FPAI to supply an inventory of supplies and, by the fifth of each month, a list of supplies to be ordered.

Several weeks later, on January 6, 2006, Radentz sent Ackles and Ballew a letter to inform them of a serious supply shortage.  That same day, apparently in response to Radentz's letter, Ballew sent Ackles a note discussing the supply issue, stating: "This issue continues to brew . . . . The supplies have been utilized at a record pace due to outside jobs."  Ballew Dep. Ex. 115.  On January 14, with the supply issue still unresolved, Catellier emailed Ballew and again emphasized the "critical shortages" facing the MCCO and FPAI.

On January 18, Radentz and Catellier attended a meeting with Ackles and Ballew.  At the meeting the parties discussed the number of Marion County cases FPAI handled, the number of non-Marion County cases handled, the billing structure for Marion County cases, the billing structure for non-Marion County cases, and an estimated monthly cost for supplies and services.  The meeting did not go well.  The Plaintiffs claim that they felt attacked and were castigated for using too many supplies.  The Defendants allege they only expressed concern about the costs of non-Marion County autopsies.  Nevertheless, at the end of the meeting, when the Plaintiffs asked Ackles if he wanted to terminate or re-negotiate the FPAI contract, he said no.

On January 19, Ballew wrote another note stating that "[t]he additional cost to the Coroner's Budget results from the increased cost associated with performing autopsies by Dr. Radentz."  Ballew Dep. Ex. 119.  She speculated that the "outside autopsies being performed at our expense" caused the MCCO's increased operating cost.  *Id*.  Also on the 19th, Ballew emailed Jeff Seidenstein, a financial analyst in the Office of Finance and Management ("OFM"), to request additional funding.  Seidenstein assured Ballew that he would review the situation with City Controller Clifford.  Ultimately, the City Controller's Office approved Ballew's funding request.

On January 27, after receiving a note from Radentz with the requested inventory of

supplies, Ballew sent a note to Ackles stating:

> The issue concerning outside cases is becoming a source of severe friction.  As
> the group [FPAI] take on more outside cases, it causes a severe strain on our
> budget . . . . They are refusing to reimburse the county for those cases . . . . [T]heir
> costs have doubled.  Although our regular autopsies have not significantly
> changed, we are experiencing the cost and absorbing it.  Obviously this was not
> contemplated . . . . We need to have City-Legal to renegotiate this aspect so that
> Dr. Radentz can absorb some of the cost he has created.  We have been
> unsuccessful in working this matter out internally because Dr. Radentz has
> become very abrasive . . . . I understand that Dr. Radentz had a right to make
> millions of dollars.  However, we do not believe that the taxpayers should fund
> his upscale lifestyle.

Ballew Dep. Ex. 120.

Things continued to deteriorate at the MCCO.  Perhaps exacerbating the problem was the

fact that in early 2006, Radentz and Catellier had little substantive contact with Ackles.

Although Radentz arranged several lunch meetings with Ackles, they managed to meet only

twice – once in February and once in May.  At both meetings Ackles assured Radentz that

everything was fine with the FPAI contract and stated that he had no complaints whatsoever.

However, in March 2006, Ballew met with City Controller Clifford and OFM analyst

Seidenstein about the MCCO's budget.  At this meeting, the possibility of hiring a different

forensic pathology firm was raised.  Clifford followed up with Ackles and Ballew and urged

them several more times to get out of the FPAI contract.

The issues between FPAI and the MCCO came to a head in June 2006, when Ballew

hand-delivered a written notice stating that the MCCO-FPAI contract would terminate on

December 19, 2006.  In July, Radentz and Ackles met in an attempt to re-negotiate the MCCO-

FPAI contract.  No agreement was reached but Ackles stated that he wanted to keep Radentz and

Catellier at the MCCO in some capacity.  Indeed, Ballew informed Radentz in writing that he was welcome to apply for positions with the MCCO.  However, the parties dispute whether Radentz was actually offered a position at the MCCO.[3]

In the fall of 2006, the MCCO began searching for replacement forensic pathologists.  In mid-October an African-American forensic pathologist, Dr. Joye Carter, contacted the MCCO about the opening.  The Defendants hired Carter in November.  She participated in some of the subsequent hiring decisions during which the MCCO hired predominantly African-Americans. These hiring decisions increased the number of African-Americans employed by the MCCO from 16.67% (three of eighteen) in December 2004, to 26.32% (five of nineteen) in June 2006, and finally to 36% (nine of twenty-five) in December 2007.[4]  Despite these staff changes (i.e. FPAI's termination and Dr. Carter's hiring), the MCCO has not saved any money.

## III.  DISCUSSION

After the FPAI contract ended in December 2006, the Plaintiffs[5] brought this suit under

---

[3] The Plaintiffs claim that Radentz was never offered a position at the MCCO despite his expressed desire to continue working there.  The Plaintiffs also imply that Ballew falsely informed Ackles that the MCCO offered Radentz a position, which he declined.  However, the Court is unable to determine if this actually occurred because the Plaintiffs' citation to "Exhibit 145" is ambiguous.  Despite its review of the parties' briefs and submissions, the Court has been unable to locate Exhibit 145.  The Court notes that the Defendants claim only that they informed Radentz that he could apply for a position at the MCCO.

[4] The Plaintiffs provide figures for the MCCO's full-time workforce only.  The Court's figures differ because the Court included both full-time and part-time employees in its calculation.

[5] Although the Court finds that Radentz and Catellier lack prudential standing to litigate this suit, they do have Article III standing.  Therefore, the Court has jurisdiction to resolve the pending motions.  As to FPAI's standing, the Defendants assert that as a corporate entity, FPAI lacks a racial identity and, therefore, cannot bring a § 1983 suit alleging violation of the Equal Protection clause.  The Court disagrees.  Despite dicta in *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), the Court is confident that FPAI has standing

42 U.S.C. § 1983 alleging that the Defendants violated their rights under the Equal Protection Clause of the Fourteenth Amendment.[6]  The Plaintiffs admit that the Defendants could terminate the MCCO-FPAI contract; however, the Plaintiffs claim that the Defendants committed reverse race discrimination when they terminated the Caucasian Plaintiffs' contract to hire an African-American.

Before turning to the parties' substantive arguments, it is necessary to resolve a procedural issue.  In April 2009, the Plaintiffs filed a belated Motion to File a Supplemental Designation of Evidence (Docket No. 125) to correct a procedural deficiency in their prior submission.  The supplemental designation of evidence does not present new information that would somehow prejudice the Defendants.  Therefore, the Plaintiffs' motion is **GRANTED.**  In ruling on the Defendants' Motions for Summary Judgment, the Court has considered this belatedly-submitted evidence.

In order to prevail on its Equal Protection Claim, the Plaintiffs will ultimately have to convince a jury by a preponderance of the evidence that the Defendants acted with

---

to litigate a claim to redress an injury it suffered from alleged racial discrimination.  *See Triad Assocs., Inc. v. Robinson*, 10 F.3d 492 (7th Cir. 1993); *Gersman v. Group Health Ass'n, Inc.*, 931 F.2d 1565, 1569 (D.C. Cir. 1991), *vacated on other grounds by*, 502 U.S. 1068 (1992), *and reinstated by*, 975 F.2d 886 (D.C. Cir. 1992); *Hudson Valley Freedom Theater, Inc. v. Heimbach*, 671 F.2d 702, 706 (2d Cir. 1982).

[6] The Plaintiffs sued Ackles and Ballew in both their official and individual capacities and also named Marion County as a Defendant.  The Defendants vigorously argue that Ackles and Ballew cannot be sued in their official capacities because a suit against an official-capacity defendant is actually a suit against the governmental entity itself.  Because the Plaintiffs named Marion County as a Defendant, the Defendants claim that the official-capacity suits against Ackles and Ballew are redundant.  In addition, the Defendants argue that Ballew cannot be held individually liable because she did not participate in or personally cause the Plaintiffs' harm.  However, given that the Defendants prevail on the merits, the Court will not address these arguments other than to note that they are legally sound.

discriminatory intent when they terminated the FPAI contract.  The Plaintiffs can do so either "by offering direct proof of discriminatory intent, or [they] may prove discriminatory intent by circumstantial evidence."  *Williams v. Seniff*, 342 F.3d 774, 788 (7th Cir. 2003).  Because the Plaintiffs meet their burden under the latter standard it is not necessary to discuss the former.

The indirect method "is usually accomplished through the use of the burden-shifting paradigm of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)."  *Williams*, 342 F.3d at 788.  Thus, "the same standards for proving intentional discrimination apply to Title VII and § 1983 equal protection."  *Id*. n.13; *see also Salas v. Wis. Dep't of Corr.*, 493 F.3d 913, 926 (7th Cir. 2007); *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 750 n.2 (7th Cir. 2006) (noting that Title VII and § 1983 claims are analyzed under the same framework, the same standard of liability is imposed, and "[t]he only difference between a claim under Title VII and a claim under § 1983 is who can be named as a defendant in the action").  "Under the *McDonnell Douglas* approach, 'the plaintiff first must establish by a preponderance of the evidence a prima facie case of discrimination, which creates a presumption that the employer unlawfully discriminated against the plaintiff.'"  *Williams*, 342 F.3d at 788 (quoting *Helland v. South Bend Cmty. Sch. Corp.*, 93 F.3d 327, 329 (7th Cir. 1996)).  "Once a plaintiff establishes a prima facie case, the burden shifts to the employer to produce evidence of a legitimate, nondiscriminatory reason for the action alleged by the plaintiff to be discriminatory."  *Id.*  "Once the employer has shouldered its burden of production, the plaintiff then must establish by a preponderance of the evidence that the proffered reasons for the alleged discriminatory action are pretextual."  *Id.*

In order to establish a prima facie case of racial discrimination under the *McDonnell Douglas* method and raise a presumption of discrimination, a plaintiff must show that: (1) he is a

member of a protected class; (2) he was meeting the employer's legitimate employment expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably than members of the protected class. *Burks*, 464 F.3d at 750-51.  Although some courts have added a fifth requirement – that "the defendant acted with discriminatory intent" – the *Williams* court emphasized that this was a "redundancy."  *Williams*, 342 F.3d at 788; *see also Salas*, 493 F.3d at 926 (quoting *Williams*, 342 F.3d at 788) ("Although some cases . . . have suggested that a fifth, freestanding element – proof of discriminatory intent – is necessary to establish a prima facie equal protection violation . . . those cases 'are best read as simply emphasizing the requirement that § 1983, like disparate treatment cases under Title VII, require ultimately proof of discriminatory intent.'").

In the indirect method, "[t]he prima facie case and pretext analyses often overlap." *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 838 (7th Cir. 2009).  Therefore, the Seventh Circuit has held that courts "can proceed directly to the pretext inquiry if the defendant offers a nondiscriminatory reason for its action." *Id.* (citing *Adelman-Reyes v. St. Xavier Univ.*, 500 F.3d 662, 665 (7th Cir. 2007)).  Because the Plaintiffs establish a presumption of discrimination using the indirect method of proof, the Court now turns to the pretext determination.

Under either method of proof, a plaintiff's failure to cast doubt on a defendant's nonretailiatory explanation will doom the plaintiff's claim. *Argyropoulous v. City of Alton*, 539 F.3d 724, 736 n.6 (7th Cir. 2008).  Thus, when a defendant offers a nondiscriminatory explanation for his conduct, the plaintiff must show that this explanation is pretext.  To prove that a defendant's proffered justification is actually pretext, a plaintiff "must show: (1) the [defendant's] 'nondiscriminatory reason was dishonest'; and (2) that the [defendant's] 'true

reason was based on a discriminatory intent.'" *Hobbs v. City of Chicago*, 573 F.3d 454, 461 (7th Cir. 2009) (quoting *Fischer v. Avande, Inc.*, 519 F.3d 393, 403 (7th Cir. 2008)). Pretext requires "more than just faulty reasoning or mistaken judgment on the part of the employer; it is [a] 'lie, specifically a phony reason for some action.'" *Argyropoulos*, 539 F.3d at 736 (quoting *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 737 (7th Cir. 2006)). In short, the plaintiff must show that the defendant's reasons "were merely made up to cover up their discriminatory reasons." *Keri v. Bd. of Trs. of Purdue Univ.*, 458 F.3d 620, 646 (7th Cir. 2006). When making pretext determinations, a court does not "sit as a 'super personnel review board that second-guesses an employer's facially legitimate business decisions.'" *Argyropoulous*, 539 F.3d at 736 (quoting *Culver v. Gorman & Co.*, 416 F.3d 540, 547 (7th Cir. 2005)). Instead, the court asks "only whether the employer's explanation was 'honestly believed.'" *Id.* (quoting *Culver*, 416 F.3d at 540). "If a reasonable fact finder would be compelled to believe the [defendant's] explanation, then the [defendant] is entitled to summary judgment." *Id.*

In the instant case, the Defendants' justification is essentially that the FPAI contract was terminated because it was too expensive.[7] In response, the Plaintiffs claim that the Defendants' justification is pretext because the Defendants' "desire to hire a black pathologist [was] expressly stated." Resp. at 31. In support of this assertion the Plaintiffs point to an incident in early 2005, before the FPAI contract was even contemplated, when Dr. Ackles said that he would like to have an African-American pathologist associated with the office. Also early in his

---

[7] Specifically, the Defendants claim: "(1) the FPAI Contract cost too much money; (2) [the] MCCO did not have the funds to pay for the FPAI Contract or purchase supplies for FPAI to perform autopsies; and (3) FPAI should not be performing out-of-county autopsies at the MCCO facility without compensating [the] MCCO." Def. Br. at 31. In the Court's opinion, these three arguments boil down to an assertion that the FPAI contract was too expensive.

tenure as Coroner, either Ackles or Ballew consulted an African-American company about providing autopsy services for the MCCO.  Both of these events occurred well before the FPAI contract was signed or terminated.  In addition, these statements are no more than stray comments unrelated to the decision to terminate FPAI.  As such, they are insufficient to support an inference of pretext.  *Schaffner v. Glencoe Park Dist.*, 256 F.3d 616, 623 (7th Cir. 2001); *Schreiner v. Catepillar, Inc.*, 250 F.3d 1096, 1099 (7th Cir. 2001) ("Stray workplace comments unrelated to the alleged discriminatory employment decision are not sufficient to support an inference of discrimination."); *see also Schuster v. Lucent Tech., Inc.*, 327 F.3d 569, 576 (7th Cir. 2003) (noting that stray comments only tenuously related to the allegedly discriminatory decision cannot raise a genuine issue of material fact regarding the decision).

The Plaintiffs' second tactic – accusing the Defendants of changing their story – is no more convincing.  Indeed, the Plaintiffs' second argument completely mischaracterizes the Defendants' conduct in an attempt to find a nefarious purpose where none exists.  Although the Plaintiffs claim that the Defendants' "explanations for terminating the FPAI contract have changed in the two and a half years since the notice was given, and have evolved even in the course of this lawsuit," Resp. at 32, the Court disagrees.  The Defendants have consistently maintained that they terminated the FPAI contract because of its cost.  In their opening brief, the Defendants explain that they reached the conclusion that the contract was too expensive by relying on an opinion from City Controller Clifford.  Although the Defendants acknowledge that they also believed the contract was illegal, the fact that the Defendants had several reasons for terminating the contract does not support a finding of pretext.  *See Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 473 (7th Cir. 2002); *see also Fane v. Locke Reynolds, LLP*, 480 F.3d 534,

541 (7th Cir. 2007) (stating that if the defendant "honestly believed the reasons it gave, [the plaintiff] loses even if the reasons are foolish, trivial or baseless" and noting that a defendant can rely on more than one justification "simultaneously, regardless of whether it emphasized one over the others at a given time").  In short, the Plaintiffs' assertion that the Defendants are trying to hide their actual motive seems unbelievable given the numerous communications between the Defendants and the City Controller discussing the looming budgetary shortfall.

Finally, the Plaintiffs' assertion that FPAI's termination, and Carter's subsequent hiring, did not actually save money does not convince the Court that the Defendants' justification is mere pretext.  The Court will not "sit as a 'super personnel review board" and second-guess the Defendants' legitimate business decisions.  *Argyropoulous*, 539 F.3d at 736.  The fact that the Defendants' conduct did not actually generate the savings that they had hoped does not convert a valid, non-discriminatory, fiscal decision into invidious racial discrimination.  Because the Plaintiffs have not established that there is an issue of material fact regarding whether the Defendants' justifications are pretext for unlawful discrimination, the Defendants' Motion for Summary Judgment is **GRANTED.**

After the Defendants filed their initial Motion for Summary Judgment, the Plaintiffs amended their Complaint and added FPAI as a Plaintiff.  In response, the Defendants filed a Motion for Partial Summary Judgment (Docket No. 116).  In their brief, the Defendants claim that "FPAI has limited compensatory damages, if any," Def. Br. at 2, and they vigorously argue that FPAI is not entitled to "personal damages" for emotional distress or punitive damages.[8]

---

[8] Although the Court's other rulings in this entry render this Motion moot, the Court does note that many courts have refused to allow corporate entities to recover damages for emotional distress.  *See Irish Lesbian and Gay Org. v. Giuliani*, 143 F.3d 638, 650 (2d Cir. 1998) (stating

Because the Court has granted summary judgment for the Defendants on all of the Plaintiffs' claims, the Defendants' Motion for Partial Summary Judgment is **DENIED AS MOOT.**

<u>**CONCLUSION**</u>

For the foregoing reasons, the Plaintiffs' Motion to File a Supplemental Designation of Evidence (Docket No. 125) is **GRANTED.**  The Defendants' Motion for Summary Judgment (Docket No. 82) is **GRANTED** as to all claims and all Defendants.  The Defendants' Motion for Summary Judgment against FPAI (Docket No. 116) is **DENIED AS MOOT.**

SO ORDERED:    02/08/2010

_William T. Lawrence_
Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana


Copies to:

Harold R. Bickham
Barnes & Thornburg LLP
hbickham@btlaw.com

Kara M. Kapke
Barnes & Thornburg LLP
kara.kapke@btlaw.com

Jeffrey S. McQuary
Brown Tompkins Lory
jmcquary@brown-tompkins-lory.com

Gary R. Welsh
gwelsh@ameritech.net

---

that an association or corporation "cannot suffer humiliation or other emotional distress"); *Perry v. Manocherian*, 675 F. Supp. 1417, 1430 (S.D.N.Y. 1987) ("[T]his court fails to see how an entity can suffer emotional distress.").